# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

SAMANTHA BANKS and
AMY SANUSI,

      Plaintiffs,

v.

GRADY MEMORIAL HOSPITAL
CORPORATION,

      Defendant.

Civil Action No.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Samantha Banks and Amy Sanusi file this Complaint against Defendant Grady Memorial Hospital Corporation ("Defendant"). Plaintiffs show the Court as follows:

## INTRODUCTION

1.  This case concerns discrimination on the basis of national origin and retaliation for opposing such discrimination. Tabitha Johnson, Defendant's Director of its Mother/Baby Unit (the "Unit"), harassed and discriminated against employees in the Unit who were of African nationality or origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). Defendant was repeatedly made aware of Ms. Johnson's unlawful conduct but nevertheless failed

to take reasonable (or any) steps to stop or prevent Ms. Johnson's discriminatory treatment of the Unit's African nurses and/or African applicants for positions within the Unit.

2.      In particular, Defendant retaliated against Plaintiff Sanusi, a native of Sierra Leone, by denying her a promotion for which she was well qualified in retaliation for Ms. Sanusi's repeated opposition to Ms. Johnson's discriminatory conduct towards herself and the Unit's other African nurses.  Further, Defendant discriminated against Ms. Sanusi on the basis of her national origin by terminating her employment.  In addition, or in the alternative, Defendant retaliated against Ms. Sanusi by terminating her employment after she repeatedly opposed Ms. Johnson's discriminatory conduct.

3.      Similarly, Defendant retaliated against Plaintiff Banks, who is of African descent, by disciplining her and then constructively terminating her employment after she opposed Ms. Johnson's discriminatory conduct against the Unit's African nurses, by, *inter alia*: repeatedly complaining to Human Resources after Ms. Johnson made disparaging comments about/towards the Unit's African nurses; directly opposing discriminatory comments made by Ms. Johnson concerning her express desire to reject job applicants who she believed to be of

African origin; and voicing opposition to Ms. Johnson's assumption of the Director role based on her history of discrimination against individuals from Africa.

4.    Defendant's violations of Title VII created an immense amount of emotional distress and stress for Plaintiffs for which they both required, among other things, medical leave and treatment.

5.    Ms. Sanusi asserts claims against Defendant under Title VII for retaliatory denial of promotion (Count I), discriminatory termination on the basis of national origin (Count II), and retaliatory termination (Count III).

6.    Ms. Banks asserts claims for retaliation and retaliatory termination against Defendant under Title VII (Counts IV and V).

7.    Plaintiffs seek all available relief under Title VII, including lost wages and benefits, compensatory damages, punitive damages, prejudgment and post-judgment interest, and attorneys' fees and costs.

## JURISDICTION AND VENUE

8.    This court has federal-question jurisdiction over Plaintiffs' Title VII claims, pursuant to 28 U.S.C. § 1331.

9.    Pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 2000e-5(f)(3), and Local Rule 3.1(B), venue is proper in this Court because the unlawful employment

practices described herein were primarily committed within the Atlanta Division of the Northern District of Georgia.

## PARTIES

10.     Plaintiff Amy Sanusi is a citizen of Sierra Leone and a permanent resident of the United States; she submits herself to the jurisdiction of the Court.

11.     Ms. Sanusi was employed by Defendant from approximately February 2017 until on or about October 6, 2020.  At the time that Defendant terminated her employment, her title was Registered Nurse.

12.     Plaintiff Samantha Banks is a citizen of the United States of America and a resident of the State of Georgia; she submits herself to the jurisdiction of the Court.

13.     Ms. Banks was employed by Defendant from approximately March 2019 to on or about May 6, 2020.  At the time that Defendant constructively terminated her employment, her title was Clinical Staff Manager.

14.     Defendant is a Georgia nonprofit corporation with its principal place of business at 80 Jesse Hill Jr. Drive SE, P.O. Box 26145, Atlanta, Georgia 30303.

15.     Defendant may be served with process through its registered agent, Timothy Jefferson, at 80 Jesse Hill Jr. Drive SE, Atlanta, Georgia 30303.

16.    Defendant is an "employer" within the definition of Title VII and is governed by Title VII.

17.    Plaintiffs were "employee[s]" of Defendant within the meaning of Title VII at all times relevant to this Complaint.

## ADMINISTRATIVE EXHAUSTION

18.    Plaintiffs have satisfied all administrative prerequisites for bringing their Title VII claims in this court.

19.    On July 30, 2020, Ms. Banks timely filed a Charge of Discrimination (Charge No. 410-2020-05449) with the Equal Employment Opportunity Commission ("EEOC"), in which she asserted her Title VII claims against Defendant.

20.    On December 8, 2020, Ms. Sanusi timely filed a Charge of Discrimination with the EEOC (Charge No. 410-2021-01842), in which she asserted her Title VII claims against Defendant.

21.    On February 2, 2021, the EEOC issued Notices of Right to Sue regarding both Plaintiffs' Charges of Discrimination.

22.    Plaintiffs bring this suit within ninety (90) days of their receipt of their respective Notices of Right to Sue.

## STATEMENT OF FACTS

23.    Plaintiff Amy Sanusi was Defendant's employee from approximately February 2017 to on or about October 6, 2020.  She was and is a Registered Nurse.

24.    Ms. Sanusi worked in the Unit throughout her employment with Defendant.

25.    Ms. Sanusi is originally from Sierra Leone.  She has lived and worked in the United States for over thirty (30) years.  She spent several of those years gaining leadership experience as a Charge Nurse, both prior to and after her employment with Defendant began.

26.    During her employment with Defendant, Ms. Sanusi received ten (10) Daisy Award nominations, Defendant's highest nursing award.  Ms. Sanusi was awarded as an honoree in November 2019.

27.    Plaintiff Samantha Banks, a Registered Nurse, began her career with Defendant on or about March 4, 2019, and began working in the Unit.

28.    Unit nurses reported either to Charge Nurses or Clinical Staff Managers, whichever was available that day.  Charge Nurses, in turn, reported to Clinical Staff Managers.  Clinical Staff Managers reported to the Unit Director.

29.    On or about April 24, 2019, then-Clinical Staff Manager Tabitha Johnson called Ms. Banks into her office to discuss complaints that she had received

6

about some of the nurses in the Unit.  Specifically, Ms. Johnson stated that the African nurses in the Unit tended to be "rough, especially those Nigerians."  The nurses Ms. Johnson was referring to were all of African descent.

30.    That afternoon, on or about April 24, 2019, Ms. Banks informed the Unit's then-Director, Evelyn Laka, of the discriminatory statements that Ms. Johnson had made about the Unit's African nurses.  Ms. Laka stated that she would talk to Ms. Johnson.

31.    Ms. Johnson made numerous statements about Nigerians and their "ways" to Ms. Banks and in her presence.

32.    On approximately June 27, 2019, Ms. Banks and Ms. Johnson were members of a panel interviewing candidates for a nursing position within the Unit. Ms. Johnson stated that she would not hire any more African nurses.  Ms. Johnson further stated that she would reject resumes with "African-sounding names."  When Ms. Banks asked for the rationale supporting Ms. Johnson's position, Ms. Johnson stated that it was "time to change the face of the Unit," or words to that effect.

33.    Ms. Banks is approximately 34% Nigerian and her direct ancestors were almost exclusively from Africa and Nigeria.   Ms. Banks challenged Ms. Johnson's statements by raising concerns about the fairness of Ms. Johnson's position to Ms. Laka.

34. Ms. Banks's opposition to Ms. Johnson's discrimination towards the Unit's African nursing staff and job applicants who Ms. Johnson believed to be African constituted protected activity under Title VII.

35. On or about June 28, 2019, Ms. Johnson created a pie chart on her computer representing the different ethnicities of the Unit's staff. Ms. Johnson told Ms. Banks that there were "too many Nigerians or Africans," and that it was "time to dilute some of the Nigerians out," or words to that effect.

36. Ms. Johnson shared the pie chart with the Unit's Clinical Nurse Educator, Carlotta Gabriele, Ms. Laka, and Ms. Banks. Ms. Johnson informed Ms. Banks that she would be meeting with Sabrina Broadnax of Human Resources to discuss the pie chart.

37. In response to the pie chart, Ms. Banks informed Ms. Johnson that she was approximately 99% African. Ms. Johnson's treatment of Ms. Banks deteriorated after Ms. Banks made that disclosure.

38. Ms. Banks and Ms. Gabriele asked Ms. Laka, who is of African descent, why she allowed Ms. Johnson to discriminate against the Unit's African nurses. Ms. Laka acknowledged that Ms. Johnson treated her badly and stated that she would speak with Ms. Johnson.

39.   Ms. Laka never corrected Ms. Johnson's discriminatory behavior, even in the presence of other leaders and staff members, and appeared to be intimidated by Ms. Johnson, who often treated Ms. Laka with disdain.

40.   When Ms. Sanusi began working in the Unit, African and foreign nurses constituted a majority of the Unit's approximately twenty-five (25) to thirty (30) nurses.

41.   The Unit's nursing staff was effectively divided into two camps, American nurses versus African and foreign nurses.  The American nurses largely avoided interacting with the African and foreign nurses, who they often derided.

42.   In approximately August 2019, the Unit's nursing staff was informed that several Charge Nurse positions were being eliminated.  Those Charge Nurses whose positions were being eliminated, including Ms. Banks, would have the opportunity to apply for either the newly created role of Clinical Care Coordinator or Clinical Staff Manager.

43.   On or about August 19, 2019, Defendant hired Oluseyi Abatan, who is Nigerian, as Clinical Staff Manager.  Ms. Laka informed Ms. Johnson that she and Ms. Abatan would share an office as Clinical Staff Managers.

44.     In response to the news that she would be sharing an office with Ms. Abatan, Ms. Johnson told Ms. Banks, "I refuse to share an office with that loud, obnoxious Nigerian," or words to that effect.

45.     During August 2019, Ms. Johnson made several remarks to Ms. Banks about the Nigerian nurses.  In particular, she stated that Ms. Abatan was "sloppy, loud, and aggravating," or words to that effect.

46.     On or about August 29, 2019, Ms. Banks interviewed for the role of Clinical Staff Manager, which she accepted on or about September 6, 2019.

47.     In approximately October 2019, Ms. Sanusi, who was then a Charge Nurse, applied for the position of Clinical Care Coordinator.

48.     While both Charge Nurses and Clinical Care Coordinator had some supervisory duties in addition to patient-care duties, the Clinical Care Coordinator position would be a promotion from Charge Nurse.

49.     In approximately late October 2019, Ms. Laka's employment with Defendant was terminated.  During that same time period, Linda Wildey, who had previously served as Vice President of Women's Services, was rehired in that role on an interim basis.

50.     Ms. Sanusi interviewed for the position of Clinical Care Coordinator and was provided an offer by Defendant's Human Resources department on or about November 5, 2019, which included a salary increase.

51.     Ms. Sanusi accepted the offer and was provided with a start date. Nevertheless, Ms. Johnson and Ms. Wildey subsequently informed Ms. Sanusi that they were rescinding the offer because Ms. Sanusi had a reprimand in her personnel file that was more than nine (9) months old.

52.     According to Defendant's official policy, an employee may not apply for a new position with Defendant if they have received a reprimand in the previous twelve (12) months.

53.     However, Defendant's widely known and routine practice was to allow employees to apply for positions so long as they did not have any reprimands within the preceding six (6) months.  In fact, on or about September 27, 2019, Ms. Sanusi was encouraged to apply for the role of Clinical Care Coordinator by Deonte Fuller in Defendant's Human Resources Department, even though he knew that Ms. Sanusi had received a reprimand within the last 12 months.

54.     Rather than adhere to Defendant's widely-known and standard practice of permitting employees to apply for positions if the employee did not have a

reprimand within the preceding 6 months, Ms. Johnson and Ms. Wildey informed Ms. Sanusi that she would be required to wait the full 12-month period.

55.     Despite Ms. Johnson's and Ms. Wildey's enforcement of the 12-month policy against Ms. Sanusi with respect to her application for the Clinical Care Coordinator position, Ms. Johnson and Ms. Wildey permitted an American nurse who had received a reprimand within the preceding 12 months to apply for that position.

56.     Ms. Sanusi complained to Tom Earnest, Defendant's Director, Human Resources Strategic Services and Delivery, of Ms. Johnson's and Ms. Wildey's denial of her application for the Clinical Staff Manager position and the inequitable application of the 12-month policy.  However, Mr. Earnest affirmed the denial of Ms. Sanusi's promotion.

57.     Ms. Abatan and Ms. Banks often worked together during their orientation period as new Clinical Staff Managers.  They were regularly singled out by leadership for questioning regarding their competency as new managers. Ms. Johnson, and those American staff members in the Unit who were close to her, bullied, harassed, and used foul and condescending language towards Ms. Banks.

58.     On or about November 8, 2019, Ms. Banks sent an email to Ms. Wildey in which she expressed her concerns about Ms. Johnson's behavior towards her.

59.     On or about November 21, 2019, Ms. Sanusi was named November's Daisy honoree.

60.     On or about November 25, 2019, Ms. Banks participated in a leadership meeting, wherein she was verbally attacked by Ms. Johnson.   Specifically, Ms. Johnson attacked Ms. Banks's intelligence and competence in front of other members of the Unit's leadership team.  Although none of the other members spoke up during the meeting, they later told Ms. Banks that Ms. Johnson's behavior had been unruly and inappropriate.

61.     As a result of Ms. Johnson's sustained, retaliatory, and abusive attacks on Ms. Banks's competence and intelligence, Ms. Banks began experiencing severe anxiety.

62.      On November 25, 2019, Ms. Banks escalated her concerns about Ms. Johnson's behavior to Ms. Wildey.   Ms. Banks told Ms. Wildey that she believed that Ms. Johnson's hostility towards her was motivated by the fact that Ms. Banks had reported Ms. Johnson's remarks about Africans, as well as Ms. Johnson's stated unwillingness to hire qualified applicants on the basis of that African descent, to then-Director Laka.

63.     Ms. Banks's statements to Ms. Wildey concerning Ms. Johnson's discriminatory conduct constituted protected activity under Title VII.

64.     On November 25, 2019, Ms. Banks informed Ms. Wildey that she was taking a mental health day from work.  Ms. Banks needed to take a mental health day as a result of the stress and anxiety caused by Ms. Johnson's retaliatory conduct.

65.     On or about November 26, 2019, and as a result of Ms. Johnson's sustained hostility towards her, Ms. Banks sought treatment from her primary care physician, who prescribed her antidepressants for the overwhelming stress and anxiety that she was experiencing.  That same day, Ms. Banks informed Ms. Wildey that she was taking medical leave related to her stress and anxiety until December 2, 2019.

66.     Ms. Banks's anxiety caused by Ms. Johnson's retaliation was severe. It interfered with her health and personal life, including her marriage.

67.     Ms. Banks sought counseling through Defendant's Employee Assistance Program.

68.     On or about November 27, 2019, Ms. Banks escalated her concerns about Ms. Johnson's behavior to Human Resources Director Earnest via an email. Ms. Banks noted that she previously had informed Ms. Wildey of Ms. Johnson's bullying, incivility, and defamatory statements.   Ms. Banks further noted that Ms. Johnson had refused to orient Ms. Banks in her new position as Clinical Staff

Manager, forcing Ms. Banks to acclimate to her new role without the support of leadership.

69.    In response to Ms. Banks's email, on November 27, 2019, Mr. Earnest stated that "I think it best to investigate the situation and as such I am asking Deonte Fuller to reach out to you to[] obtain more detail."

70.    On information and belief, Mr. Fuller told Ms. Johnson that Ms. Banks had filed a complaint against her.    After Ms. Banks filed her complaint, Ms. Johnson's behavior towards Ms. Banks became increasingly aggressive and hostile.    This included hostile and retaliatory treatment of Ms. Banks in Unit leadership meetings.

71.    Although the leadership meetings were ostensibly focused on matters broadly related to the Unit's leadership team, the meetings were used as a forum in which Ms. Johnson could attack Ms. Banks.

72.    In particular, on December 3, 2019, a leadership meeting presided over by Ms. Wildey began with a discussion of Ms. Banks's working relationship with Ms. Johnson, even though no such discussion was on the meeting's agenda.    The meeting participants also spoke more broadly about internal strife between the Unit's managers, including Ms. Johnson.

73.     In the December 3, 2019 meeting, Ms. Wildey informed the Unit's leadership team that she was designating Ms. Johnson and Naphia Bennett as her "go-to" managers, with whom she would share confidential information that would be withheld from the Unit's other managers, including Ms. Banks.

74.     Denise Mayhan, Defendant's Project Manager for the "Talk With Me Baby" program, attended the December 3, 2019 meeting.  Ms. Mayhan participated in the meeting as a mediator, at the request of Ms. Wildey.

75.     Ms. Mayhan openly threatened Ms. Banks's employment with Defendant, stating that Ms. Banks would be "gotten rid of" if she did not "get over the hurt feelings" and learn to get along.

76.     After the meeting, Ms. Wildey asked to speak with Ms. Banks.  During their conversation, Ms. Wildey expressed concern over the medical leave that Ms. Banks had taken and inquired into Ms. Banks's mental health.  Ms. Banks stated that she was capable of performing her duties, despite the immense stress caused by the challenging work environment fostered by Ms. Johnson.

77.     Ms. Wildey then asked questions about Ms. Banks's working relationship with Ms. Johnson.  Ms. Banks stated that she preferred not to discuss that issue while Human Resources' investigation into Ms. Johnson was pending.

78.    Next, Ms. Wildey reiterated that she would only confide in her "go-to" managers on certain issues.  When Ms. Banks inquired into Ms. Wildey's rationale for keeping information pertaining to the Unit from some of the Unit's managers, Ms. Wildey stated that she did not owe Ms. Banks or anyone else an explanation.

79.    Following the December 3, 2019 meeting and her talk with Ms. Wildey, Ms. Banks again emailed Mr. Earnest, this time copying John Haupert, Defendant's CEO, and Jacqueline Herd, Defendant's Chief Nursing Officer.   In that email, Ms. Banks detailed: what transpired during the meeting; the statements made by Ms. Wildey and Ms. Mayhan during the meeting; and her conversation with Ms. Wildey following the meeting.

80.    In her December 3, 2019 email, Ms. Banks stated that her conversation with Ms. Wildey was a form of bullying, harassment, and intimidation.  Ms. Banks noted that Ms. Wildey previously had been unresponsive to her attempts to address unprofessional conduct in the Unit.  Ms. Banks also noted that Ms. Johnson, with whom she still shared an office, continued to be hostile towards her.

81.    In her December 3, 2019 email, Ms. Banks further asked Mr. Earnest what the investigation into Ms. Johnson's conduct looked like going forward.  She asked whether there was another HR member who could investigate, as Mr. Fuller

and Ms. Johnson had a relationship with one another, and Ms. Banks was concerned about Mr. Fuller's bias.

82.    On or about December 5, 2019, Ms. Banks had a meeting with Patient Experience Consultant Kandise Bird, in which Ms. Bird repeatedly interrogated Ms. Banks over the course of an hour about her working relationship with Ms. Johnson, even though the meeting purportedly concerned patient satisfaction.

83.    On December 6, 2019, Ms. Banks sent an email to Mr. Haupert as "a sincere plea for help."  Ms. Banks described her December 5, 2019 meeting with Ms. Bird and stated that the Unit was a "hostile work environment that is palpably stressful."  Ms. Banks stated that "[t]he work environment on my current unit is affecting my well-being in every way and I do not feel safe."  Additionally, she stated that she would be visiting her primary care physician again "to help find a solution for coping with the tremendous amount of stress I am experiencing. . . ."

84.    Ms. Banks's December 6, 2019 email to Mr. Haupert constituted protected activity under Title VII.

85.    On or about December 11, 2019, Ms. Banks met with Mr. Earnest for approximately forty-five (45) minutes to discuss her prior email to him.  She also told Mr. Earnest about Ms. Johnson's constant disparaging remarks about Africans and Nigerians.

86.     Mr. Earnest stated that he could not do anything to stop the bullying, harassment, and incivility of which Ms. Banks had complained, but he would follow up with Ms. Banks about Ms. Johnson's discriminatory remarks.   Ms. Banks suggested that Mr. Earnest should also speak with other members of the Unit's leadership team, as they had similar experiences with Ms. Johnson.

87.     Despite his assurances, Ms. Banks never heard anything further from Mr. Earnest regarding the investigation into Ms. Johnson's discriminatory remarks.

88.     Ms. Banks's December 11, 2019 meeting with Mr. Earnest constituted protected activity under Title VII.

89.     On or about December 19, 2019, Ms. Wildey promoted Ms. Johnson to the position of interim Director of the Unit.

90.     Shortly thereafter, Ms. Wildey announced that she would be stepping down as Vice President of Women's Services.  Nicole Lescota replaced Ms. Wildey in that role in approximately January 2020.

91.     On or about February 27, 2020, Ms. Johnson, who had been working as the Unit's Director on an interim basis, interviewed to become the Unit's permanent Director.

92.     During her interview on or about February 27, 2020, Ms. Johnson stated that she preferred to hire non-African nurses because she believed that there

were too many African nurses working in the Unit.  Further, Ms. Johnson told the interview panelists that she specifically had requested that Human Resources "send me diversity because I need diversity."  Ms. Johnson also stated that "you can't have too much of the same," which was a problem from which she believed the Unit suffered because, according to Ms. Johnson, it had too many African nurses.

93.     Ms. Sanusi was on Ms. Johnson's interview panel, which also included Ms. Lescota.  Ms. Sanusi candidly offered her opinion of Ms. Johnson at the request of the other panelists because she believed that it was being given in confidence.

94.     Specifically, Ms. Sanusi raised concerns about Ms. Johnson's discrimination towards non-American nurses, particularly those from Africa.  These concerns were echoed by several other panelists.

95.     Upon information and belief, Ms. Lescota recorded Ms. Sanusi's comments and shared them with Ms. Johnson.  After Ms. Johnson became aware of Ms. Sanusi's statements, she acted increasingly aggressively towards Ms. Sanusi.

96.     Ms. Sanusi's opposition to Ms. Johnson's discriminatory conduct towards the Unit's African nurses and African job applicants constituted protected activity under Title VII.

97.     Over the panelists' objections regarding Ms. Johnson's discriminatory statements and expressions of her intended decision-making process, Defendant offered Ms. Johnson the Director of the Unit position, which she accepted.

98.     As Director of the Unit, Ms. Johnson was a managerial employee who had the authority to make decisions regarding who to hire, promote, and fire on behalf of Defendant.

99.     After Ms. Johnson assumed the role as the Unit's permanent Director, Ms. Banks, other members of the Unit's leadership team, and other Unit staff members complained to Ms. Lescota about the discrimination, bullying, and harassment that they had suffered and continued to suffer at Ms. Johnson's hands. Ms. Lescota ignored those complaints, responding that she had been given "the scoop" by Ms. Wildey on the Unit's staff and interpersonal issues before she became Vice President of Women's Service.

100.    Ms. Banks's complaints to Ms. Lescota regarding Ms. Johnson's history of discriminatory conduct constituted protected activity under Title VII.

101.    In approximately February 2020, Helen Okudo, who is of Nigerian descent, submitted documentation that contained errors. Although Ms. Okudo corrected those errors before the end of her shift, Ms. Johnson insisted that she be suspended immediately.

21

102.   Ms. Johnson justified her push for Ms. Okudo's immediate suspension by stating that she had received a patient complaint that same day about Ms. Okudo's bedside manner.   Ms. Johnson also stated that she never had liked Ms. Okudo because she was "rough," and her "thick" Nigerian accent was difficult to understand.

103.   When Ms. Johnson confronted Ms. Okudo about the error, Ms. Okudo admitted the mistake.   Ms. Johnson then escalated the investigation to Defendant's Compliance Department.

104.   It was unusual for the Unit's Director to become involved in a disciplinary measure of this type.   Rather, such matters typically were handled by the Clinical Staff Managers, including Ms. Banks.

105.   Ms. Johnson stated that she wanted to terminate Ms. Okudo, but Ms. Banks and Ms. Abatan expressed that the incident did not warrant termination. Instead, Ms. Banks and Ms. Abatan recommended coaching and education because Ms. Okudo had been with Defendant for approximately twenty-three (23) years and had no prior complaints or disciplinary write-ups in her personnel file.

106.   Notwithstanding Ms. Banks's and Ms. Abatan's express opposition to Ms. Okudo's firing, Ms. Johnson collaborated with the Compliance Department to

terminate Ms. Okudo's employment.   Specifically, Ms. Johnson pushed to characterize Ms. Okudo's error as a HIPPA violation warranting termination.

107.   Ms. Banks's opposition to Ms. Johnson's discriminatory termination of Ms. Okudo's employment constituted protected activity under Title VII.

108.   In contrast to the treatment that Ms. Okudo received for her error, another American Unit employee accidentally sent a patient's discharge paperwork home with a different patient.  This constituted a clear HIPAA violation, but the American Unit employee was not written up, suspended, or terminated.

109.   In approximately March 2020, Ms. Johnson took several discriminatory and/or retaliatory acts against Ms. Sanusi in retaliation for the concerns Ms. Sanusi had raised as a member of Ms. Johnson's interview panel.

110.   On or about March 19, 2020, Ms. Sanusi was scheduled to meet with Ms. Lescota to voice her concerns about Ms. Johnson's discriminatory treatment. However, after Ms. Sanusi was unable to attend the meeting due to staffing needs on the Unit floor, she told Ms. Lescota that she was unsure that she was willing to reschedule because she was "very afraid."  Ms. Sanusi was describing her fear that she would be retaliated against by Ms. Johnson if she spoke up about Ms. Johnson's conduct.

23

111.   In approximately April 2020, Ms. Johnson demoted Ms. Sanusi from Charge Nurse to Floor Nurse.

112.   Ms. Johnson stated that the decision to remove Ms. Sanusi from the Charge Nurse position had been made by the previous Director of the Unit, Ms. Laka.  However, Ms. Laka left the Unit approximately six (6) months before Ms. Johnson demoted Ms. Sanusi.

113.   An American nurse named Brenda Williams replaced Ms. Sanusi as Charge Nurse.

114.   On or about April 30, 2020, Ms. Banks was called into Ms. Johnson's office to talk with Ms. Johnson and Ms. Lescota, allegedly about complaints that they claimed they had received about Ms. Banks's management style from her subordinates.  Ms. Johnson and Ms. Lescota interrogated Ms. Banks for nearly an hour about her competency.

115.   Following the April 30, 2020 meeting, Ms. Banks sought constructive feedback from one of her subordinates.  That subordinate did not express any concern to Ms. Banks regarding her solicitation of such feedback.

116.   On approximately May 6, 2020, Ms. Banks was again called into Ms. Johnson's office to meet with Ms. Johnson and Ms. Lescota.  Ms. Banks was presented with a "final written reprimand" for insubordination for seeking feedback

from her subordinates.  Ms. Banks had never before received any written or verbal warnings during her employment with Defendant.  She also had never been told not to seek feedback from her subordinates.

117.   During that meeting, Ms. Johnson stated that she was aware that Ms. Banks had filed complaints with Human Resources concerning her. Ms. Johnson told Ms. Banks that she had to "bite her tongue" to prevent herself from confronting Ms. Banks earlier.

118.   Ms. Banks refused to sign the unwarranted and retaliatory reprimand and attempted to leave the room.  However, Ms. Lescota told Ms. Banks that she would be terminated if she left the room without signing the reprimand.

119.   Fearing how an involuntary termination would look to future employers and being unwilling to sign the unwarranted and retaliatory reprimand, Ms. Banks believed that she had no choice but to resign, which she then did.

120.   Defendant constructively terminated Ms. Banks's employment in retaliation for her protected activity of repeatedly opposing Ms. Johnson's continuous and systematic discrimination against non-American employees in the Unit.

121.   In approximately June 2020, Ms. Johnson further retaliated against Ms. Sanusi by denying her the opportunity to interview for the position of Clinical

Staff Manager, for which Ms. Sanusi had applied.  Ms. Johnson's and Ms. Lescota's proffered reason for not interviewing Ms. Sanusi was that her application allegedly had been misplaced.

122.   Due to the hostile work environment caused by Ms. Johnson's harassment of the Unit's non-American nurses, including Ms. Sanusi, Ms. Sanusi began experiencing severe mental, emotional, and physical stress—including anxiety, depression, insomnia, and hypertension—for which she took a medical leave of absence from on or about June 17, 2020, until approximately July 25, 2020.

123.   On or about Friday, October 2, 2020, a blood-pressure machine being used for one of Ms. Sanusi's patients malfunctioned, causing it to incorrectly display a time that was three (3) hours delayed.  Due to the delay, the patient's doctor incorrectly alleged that Ms. Sanusi did not timely inform the doctor about the patient's blood pressure.  The incident was reported to Ms. Johnson.

124.   Ms. Johnson immediately suspended Ms. Sanusi on October 2, 2020, and instructed her to write a statement regarding the blood-pressure incident as part of an investigation that would be conducted.  Ms. Johnson directed Ms. Sanusi not to return to work until the statement was complete.

125.   On Monday, October 5, 2020, Ms. Johnson called Ms. Sanusi and informed her that the investigation into the blood-pressure incident had been

completed, even though Ms. Sanusi had not yet submitted the statement that she had drafted, at Ms. Johnson's direction, over the weekend.

126.   On October 6, 2020, Ms. Johnson terminated Ms. Sanusi, allegedly based on the false accusation that she had failed to timely inform the doctor about her patient's blood pressure.

127.   Defendant terminated Ms. Sanusi because of her national origin and/or because she engaged in protected activity of opposing national origin discrimination.

128.   After Ms. Sanusi was terminated, Katherine Corley, an American nurse in the Unit, stated "one gone, one more to go," a reference to the fact that only one more foreign nurse outside of a leadership role was left in the Unit.

129.   At the time that Defendant terminated Ms. Sanusi's employment in October 2020, only approximately three (3) to four (4) African nurses remained in the Unit, despite such nurses previously having comprised a majority of the Unit's approximately 25 to 30 nurses as late as approximately February 2020.  The Unit's shift away from employing African nurses accelerated rapidly after Ms. Johnson became Director.

130.   Ms. Johnson made a conscious and consistent effort to minimize the number of African nurses in the Unit because of her discriminatory animus against them.

131.   Defendant's actions and inactions in denying Ms. Sanusi a promotion to Clinical Staff Manager on the basis of her national origin, terminating her on the basis of her national origin, and/or retaliating against her for opposing the discriminatory conduct on the basis of national origin described above, were willful, wanton, and/or in reckless disregard for her rights under Title VII.

132.   Defendant's actions and inactions in retaliating against Ms. Banks for opposing the discriminatory conduct on the basis of national origin described above, including eventually constructively terminating her employment, were willful, wanton, and/or in reckless disregard for her rights under Title VII.

133.   Defendant acted with malice and/or with reckless indifference to Plaintiffs' federally-protected rights.

134.   Due to Defendant's violations of federal law, Plaintiffs incurred lost wages and benefits, and suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

135.   Defendant acted with the specific intent to harm Plaintiffs.

## COUNT I
### Retaliation in Violation of Title VII—Retaliatory Denial of Promotion
### (Asserted by Ms. Sanusi)

136.   Plaintiffs reassert and incorporate by reference all preceding paragraphs of the Complaint.

137.   Ms. Sanusi engaged in protected activity under Title VII by, *inter alia*, objecting to Ms. Johnson's discriminatory treatment of the African nurses within the Unit when Ms. Johnson interviewed to become the Unit's permanent Director on or about February 27, 2020, during which Ms. Johnson made known her preference for non-African nurses.

138.   Following Ms. Sanusi's objections to Ms. Johnson's discriminatory treatment of the Unit's African nurses, and after Ms. Johnson became the Unit's permanent Director, Defendant retaliated against Ms. Sanusi by denying her the opportunity to interview for the position of Clinical Staff Manager in June 2020.

139.   Defendant's retaliation against Ms. Sanusi would have dissuaded a reasonable person from engaging in protected activity.

140.   As a consequence of the retaliation she experienced from Defendant, Ms. Sanusi has incurred lost wages and benefits, and suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

141.   The actions and inactions of Defendant in retaliating against Ms. Sanusi for engaging in protected activity were willful, wanton, and/or in reckless disregard for her rights under Title VII.

142.   Defendant acted with malice and/or with reckless indifference to Ms. Sanusi's Title VII rights.

143.   Ms. Sanusi seeks all available relief under Title VII, including lost wages and benefits, compensatory damages, punitive damages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs.

## COUNT II
### Discriminatory Termination
### on the Basis of National Origin in Violation of Title VII
**(Asserted by Ms. Sanusi)**

144.   Plaintiffs reassert and incorporate by reference all preceding paragraphs of the Complaint.

145.   Ms. Sanusi, who is originally from Sierra Leone, is a member of a protected class for the purposes of Title VII.

146.   As evidenced by, *inter alia*, her numerous Daisy Award nominations and extensive leadership experience as a Charge Nurse, Ms. Sanusi was qualified for the position of Registered Nurse, which she held at the time when Defendant terminated her employment.

147.   Ms. Sanusi was terminated on or about October 6, 2020, in accordance with, and pursuant to, Ms. Johnson's continuous and systematic practice of discriminating against non-American employees, and specifically discriminating against African employees, in an ongoing campaign to reduce the number of African employees in the Unit.

148.   Ms. Johnson, as Director of the Unit, had the authority to make decisions regarding who to hire, promote, and fire on behalf of Defendant.

149.   Ms. Sanusi did not violate any work rule that would have warranted the termination of her employment.  Defendant's reliance on her alleged failure to report a patient's blood pressure as justification for her termination was pretextual, as evidenced by the cursory and incomplete nature of the investigation into the incident.

150.   As a direct and proximate result of Defendant's discriminatory termination of Ms. Sanusi, she incurred lost wages and benefits, and suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

151.   The actions and inactions of Defendant in discriminating against Ms. Sanusi on the basis of her national origin were willful, wanton and/or in reckless disregard for her rights under Title VII.

152.   Defendant acted with malice and/or with reckless indifference to Ms. Sanusi's Title VII rights.

153.   Ms. Sanusi seeks all available relief under Title VII, including lost wages and benefits, compensatory damages, punitive damages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs.

**COUNT III**
**Retaliation in Violation of Title VII—Retaliatory Termination**
**(Asserted by Ms. Sanusi)**

154.   Plaintiffs reassert and incorporate by reference all preceding paragraphs of the Complaint.

155.   Ms. Sanusi engaged in protected activity under Title VII by, *inter alia*, objecting to Ms. Johnson's discriminatory treatment of the African nurses within the Unit when Ms. Johnson interviewed to become the Unit's permanent Director on or about February 27, 2020, during which Ms. Johnson made known her preference for non-African nurses.

156.   Following Ms. Sanusi's objections to Ms. Johnson's discriminatory treatment of the Unit's African nurses, and after Ms. Johnson became the Unit's permanent Director, Defendant retaliated against Ms. Sanusi, by, *inter alia*, terminating her employment for pretextual reasons.

157.   Defendant's retaliation against Ms. Sanusi would have dissuaded a reasonable person from engaging in protected activity.

158.   As a consequence of the retaliation she experienced from Defendant, Ms. Sanusi has incurred lost wages and benefits, and suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

159.   The actions and inactions of Defendant in retaliating against Ms. Sanusi for engaging in protected activity were willful, wanton, and/or in reckless disregard for her rights under Title VII.

160.   Defendant acted with malice and/or with reckless indifference to Ms. Sanusi's Title VII rights.

161.   Ms. Sanusi seeks all available relief under Title VII, including lost wages and benefits, compensatory damages, punitive damages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs.

## COUNT IV
## Retaliation in Violation of Title VII—Retaliatory Harassment and Discipline
### (Asserted by Ms. Banks)

162.   Plaintiffs reassert and incorporate by reference all preceding paragraphs of the Complaint.

163.   Ms. Banks engaged in protected activity under Title VII by, *inter alia*:

   a. Complaining to then-Director Laka on or about April 24, 2019, that Ms. Johnson had stated that African nurses tended to be "rough, especially those Nigerians";

b.  On or about June 27, 2019, opposing the discriminatory statements that Ms. Johnson made about job applicants whose resumes indicated that they might be Nigerian by informing then-Director Laka of those statements;

c.  On or about June 28, 2019, opposing Ms. Johnson's creation of a pie chart indicating the national origin of the Unit's staff to indicate that there were too many Africans in the Unit by percentage, as well as Ms. Johnson's statements that there were "too many Nigerians and Africans" and it was "time to dilute some of the Nigerians out," by raising the issue with then-Director Laka;

d.  Filing a complaint with Tom Earnest, Defendant's Director, Human Resources Strategic Services and Delivery, regarding Ms. Johnson's harassing and abusive conduct towards the Unit's African staff; and

e.  Objecting to Ms. Johnson's discriminatory treatment of the African nurses within the Unit when Ms. Johnson interviewed to become the Unit's permanent Director on or about February 27, 2020, during which Ms. Johnson made known her preference for non-African nurses.

164.   Defendant retaliated against Ms. Banks by subjecting her to retaliatory harassment and discipline.   Specifically, Defendant imposed such intolerable working conditions on Ms. Banks—including, but not limited to, a work environment permeated by Ms. Johnson's abusive and harassing behavior towards Ms. Banks stemming from her opposition to Ms. Johnson's discriminatory conduct, as well as the demand that Ms. Banks sign an unwarranted and retaliatory final written reprimand as a condition of continuing her employment.

165.   Defendant's retaliation against Ms. Banks would have dissuaded a reasonable person from engaging in protected activity.

166.   As a consequence of Defendant's retaliatory harassment and unwarranted discipline of her, Ms. Banks suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

167.   Defendant's actions and inactions in retaliating against Ms. Banks for engaging in protected activity were willful, wanton, and/or in reckless disregard for her rights under Title VII.

168.   Defendant acted with malice and/or with reckless indifference to Ms. Banks's Title VII rights.

169.   Ms. Banks seeks all available relief under Title VII, including compensatory damages, punitive damages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs.

## COUNT V
### Retaliation in Violation of Title VII – Constructive Discharge
(Asserted by Ms. Banks)

170.   Plaintiffs reassert and incorporate by reference all preceding paragraphs of the Complaint.

171.   Ms. Banks engaged in protected activity under Title VII by, *inter alia*:

a.   Complaining to then-Director Laka on or about April 24, 2019, that Ms. Johnson had stated that African nurses tended to be "rough, especially those Nigerians";

b.   On or about June 27, 2019, opposing the discriminatory statements that Ms. Johnson made about job applicants whose resumes indicated that they might be Nigerian by informing then-Director Laka of those statements;

c.   On or about June 28, 2019, opposing Ms. Johnson's creation of a pie chart indicating the national origin of the Unit's staff to indicate that there were too many Africans in the Unit by percentage, as well as Ms. Johnson's statements that there were "too many Nigerians and

Africans" and it was "time to dilute some of the Nigerians out," by raising the issue with then-Director Laka;

d.  Filing a complaint with Tom Earnest, Defendant's Director, Human Resources Strategic Services and Delivery, regarding Ms. Johnson's harassing and abusive conduct towards the Unit's African staff; and

e.  Objecting to Ms. Johnson's discriminatory treatment of the African nurses within the Unit when Ms. Johnson interviewed to become the Unit's permanent Director on or about February 27, 2020, during which Ms. Johnson made known her preference for non-African nurses.

172.  Defendant retaliated against Ms. Banks by subjecting her to ongoing retaliatory harassment, which culminated in telling her that she had to sign an unwarranted and retaliatory final disciplinary document or she would be terminated, thereby forcing Ms. Banks to resign.

173.  Defendant constructively discharged Ms. Banks in retaliation for her protected activity of repeatedly opposing national origin discrimination and the resulting retaliation she suffered.

174. Defendant's retaliation against Ms. Banks would have dissuaded a reasonable person from engaging in protected activity.

175.  As a consequence of Defendant's retaliatory harassment and discipline of her, Ms. Banks incurred lost wages and benefits, and suffered emotional distress, inconvenience, mental anguish, and loss of enjoyment of life.

176.  Defendant's actions and inactions in retaliating against Ms. Banks for engaging in protected activity were willful, wanton, and/or in reckless disregard for her rights under Title VII.

177.  Defendant acted with malice and/or with reckless indifference to Plaintiff Banks's Title VII rights.

178.  Ms. Banks seeks all available relief under Title VII, including lost wages and benefits, compensatory damages, punitive damages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a **TRIAL BY JURY** and the following relief:

a)      A declaratory judgement that the practices of Defendant complained of herein are unlawful under Title VII;

b)      Full lost wages and benefits;

c)      Compensatory damages in an amount to be determined by the jury;

d)      Punitive damages in an amount to be determined by the jury;

e)      Attorneys' fees and costs;

f)      An award of prejudgment and post-judgement interest; and

g)      All other equitable and other further relief as this court deems just and

proper.

Respectfully submitted this 12th day of February 2021.

*/s/ Justin M. Scott*
Justin M. Scott
Georgia Bar No. 557463
Michael David Forrest
Georgia Bar No. 974300
Scott Employment Law, P.C.
160 Clairemont Avenue, Suite 610
Decatur, Georgia 30030
Telephone: 678.780.4880
Facsimile: 478.575.2590
jscott@scottemploymentlaw.com
mforrest@scottemploymentlaw.com

Counsel for Plaintiffs