**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SAMANTHA BANKS, et al.,      *
                                     *
         Plaintiffs,         *
                                       *
      v.                 *         1:21-CV-00627-ELR
                                       *
GRADY MEMORIAL HOSPITAL      *
CORPORATION,                   *
                                       *
         Defendant.        *
                                       *

_____

**O R D E R**

_____

Presently before the Court are Magistrate Judge Regina D. Cannon's Final Report and Recommendation ("R&R") [Doc. 121] and Plaintiffs Samantha Banks and Amy Sanusi's objections thereto. [Doc. 128]. The Court sets forth its reasoning and conclusions below.

## I.    Background

This case stems from Plaintiffs' allegations that they suffered employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 while working for Defendant Grady Memorial Hospital Corporation, their former employer. <u>See generally</u> Compl. [Doc. 1]. The R&R summarizes the background of this case as follows, beginning with the facts relevant to Plaintiff Banks:

The present disputes principally concern the conduct of Tabitha Johnson, an African-American female who served progressively as Clinical Staff Manager, interim Director of Grady's Mother/Baby Unit (the "Unit"), and finally as the Unit's permanent Director during the relevant period. For the most part, the operative events took place between April 2019 and October 2020.

. . .

[Plaintiffs] Banks and Sanusi, each of whom reported to Johnson, assert distinct claims but draw on some of the same circumstantial evidence. Because Sanusi's discrimination claim largely piggybacks on Banks's testimony, the facts underlying the latter's claims are addressed first.

. . .

Banks is an African-American female born in Georgia. She worked for Grady from March 2019 until she resigned on May 6, 2020. She has alleged generally that, during her employment, the Unit's nursing staff was marked by an antagonistic divide between American and foreign-born (often African) personnel. Banks claims that Johnson, a supervisory member of the American cohort, perpetuated and promoted the Unit's divide and then retaliated against her when she voiced opposition to Johnson's conduct.

. . .

Johnson began working as a Clinical Staff Manager at Grady in February 2019, just a month before Banks was hired. (Doc. 106-5 at 18–19). According to Banks, Johnson's discriminatory behavior was apparent nearly from the start. For example, in April 2019, Johnson commented to Banks that the Unit's African nurses tended to be "rough, especially those Nigerians." ([See Samantha Banks' Statement of Material Facts ("Banks SMF") ¶ 1 [Doc. 104-1]]). And in June 2019, while Banks and Johnson were serving together on an interview panel, Johnson stated that she would not hire more African nurses and would reject resumes with "African-sounding names." (Id. ¶ 2). Banks reported these incidents to the Unit's then-Director, Evelyn Laka. (Id. ¶¶ 1–2; Doc. 106-1 at 100–02).

In July 2019, Johnson created (and shared with her nursing staff) a pie chart of the different racial and ethnic groups within the Unit—for example, the chart designated the following groups: "Black," "White," "Asian," "Hispanic," "African," "Ethiopian," "Nigerian," "Haitian," and "Jamaican." (Banks SMF ¶ 3; Doc. 106-6 at 7). According to the pie chart, the Unit's composition was approximately 39% Black, 30% Nigerian, and 8% African. (Doc. 106-6 at 7). Johnson testified that, after observing what appeared to be ethnic tension between nurses that was creating a "contentious" and "very toxic atmosphere" at the Unit, she made the chart to get an idea of the Unit's demographics so she could educate herself on the different cultures represented and learn how to better communicate with each group. (Doc 106-5 at 58–59, 64–67). However, according to Banks, when Johnson showed her the chart Johnson stated that there were "too many Africans on the Unit" and added that it was time to "dilute" some of the Nigerians out. (Banks SMF ¶ 5). In response, Banks informed Johnson that she herself was 99% African, to which Johnson retorted, "Oh, so you're one of them." (Id. ¶ 4; Doc. 106-1 at 108). Banks again reported Johnson's remarks to Laka, who indicated that she would speak with Johnson. (Banks SMF ¶¶ 4, 7).

Banks testified that, after reporting Johnson's pie-chart comments in July 2019, the relationship between she and Johnson rapidly deteriorated. (Id. ¶ 4; Doc. 106-1 at 106–07). They had, in Banks's words, a "cordial" and "positive" working relationship beforehand, but from that point forward Johnson began to act "hostile, dismissive, [and] rude," "ridiculed" and "humiliated" her on a regular basis, undermined her authority, questioned her competence, gave directives without her input, and scheduled meetings without her knowledge. ([See Grady's Statement of Material Facts as to Samantha Banks ("Grady/Banks SMF") ¶ 28 [Doc. 103-2]]; Doc. 106-1 at 106–09). Although Johnson didn't again comment on Banks's ancestry, in August 2019, Johnson told Banks that she refused to share an office with a newly hired Clinical Staff Manager, whom she described as a "loud, obnoxious Nigerian." (Banks SMF ¶ 9; Doc. 106-1 at 109, 115). Around the same time, Banks heard Johnson make a comment about "nappy headed Africans." (Doc. 106-22 ¶ 12).

In September 2019, Banks was promoted to the role of Clinical Staff Manager, but her relationship with Johnson didn't improve. (Id. ¶ 13).

For example, Banks testified that staff members who were friends with Johnson remarked that she was "too stupid to be a manager," and they made other "vile" and "condescending" remarks. (Doc. 106-1 at 115). In November 2019, Banks raised concerns about Johnson's behavior to Linda Wildey, who stepped in for Laka on an interim basis after the latter left Grady. (Banks SMF ¶ 10; Doc. 106-12 at 14–17). Specifically, on November 25, 2019, Banks told Wildey that she believed Johnson discriminated against African and Nigerian nurses. (Banks SMF ¶ 11; Doc. 106-1 at 121–22). Days later, on November 27, 2019, Banks emailed Grady's Human Resources Director, Thomas Earnest, complaining that Johnson had not provided adequate training and guidance following her promotion. (Banks SMF ¶ 14; Doc. 106-2 at 26–28). Banks added that she had been the target of Johnson's "unprofessional behaviors including bullying, incivility, and defamation." (Doc. 106-2 at 27).

In response to Banks's email, Earnest told her that Deonte Fuller, the Unit's Human Resources Manager, would investigate her concerns. (Grady/Banks SMF ¶ 50; Doc. 106-2 at 26). On December 3, 2019, Banks again emailed Earnest, this time complaining of "bullying and incivility" at a leadership meeting the day before. (Banks SMF ¶ 16; Doc. 106-17 at 12–13). Specifically, Banks stated that when the Unit's work dynamics were discussed at the meeting, Wildey and a project manager insisted that staff members with "hurt feelings" needed to learn to get along. (Banks SMF ¶ 15; Doc. 106-17 at 12). Although she didn't indicate that Johnson had harassed her at the meeting, Banks reiterated her concerns about Johnson's "hostility," and she asked that another Human Resources representative be put in charge of the investigation into her claims because she believed Fuller was biased in favor of Johnson. (Banks SMF ¶ 17; Doc. 106-17 at 13).

As a part of the investigation, Earnest arranged interviews with several individuals, including Banks, Johnson, and Wildey. (Banks SMF ¶ 18). Johnson admitted that she felt personally attacked after learning about Banks's complaint, but she wasn't surprised—in her words, complaints "happen[] a lot with leadership." (Id. ¶ 22; Doc. 106-7 at 71). Nevertheless, she changed the way she interacted with Banks thereafter, emphasizing email communications to avoid misunderstandings. (Banks SMF ¶ 24; Doc. 106-5 at 150–52). Banks met with Earnest on December 11, 2019 in connection with the

investigation. (Banks SMF ¶ 19; Doc. 106-16 at 51–54). After meeting with Banks, Earnest prepared a draft report in which he recorded that Banks complained about "bullying and belittling," lack of support and inclusion, poor communication, and, specifically, about Johnson's comment that there were "too many Africans" in the Unit. (Doc. 106-17 at 32–34). Earnest didn't prepare a final version of the report but, after completing the investigation, he concluded that Banks's allegations of discrimination were unsubstantiated. (Grady/Banks SMF ¶ 56; Doc. 106-16 at 84). Around the same time in December 2019, Johnson was promoted to interim Director. (Banks SMF ¶ 23).

In January 2020, Nicole Lescota replaced Wildey as Vice President of Women's Services, the hospital department encompassing the Unit, and she quickly learned of the "backbiting and infighting" at the Unit as well as the investigation of Banks's complaint against Johnson. (Id. ¶ 25; Doc. 106-9 at 27–29). In February 2020, Johnson interviewed to become the Unit's permanent Director, which included an interview with a staff panel comprised of Banks, Sanusi, and others. (Banks SMF ¶ 29). During the panel interview, in response to a question about the division between Americans and Africans and issues of race within the Unit, Johnson told the panelists she had specifically requested that Human Resources send her diverse nursing candidates because "you can't have too much of the same." (Id. ¶ 30). Later, at her deposition, Johnson explained: "I'm not gonna just ask for Africans. I'm just not gonna ask for Americans. I'm gonna ask for all nationalities. And that was . . . what I was relaying." (Doc. 106-5 at 179).

After Johnson's interview, the panelists met with Lescota for a debriefing without Johnson present, during which Banks raised concerns about Johnson's behavior toward African nurses. (Banks SMF ¶ 31). The debrief turned into a discussion about national origin, as a panelist commented that the Unit's African staff members had developed into cliques based "on where they were from"—Lescota learned, for example, that "[t]he Nigerians and the Ethiopians or the Africans don't necessarily get along with . . . each other." (Id. ¶ 32; Doc. 106-9 at 47–49, 82). Lescota met with Johnson afterward and the two discussed both the concerns raised in the debriefing along with the need to improve the Unit's work culture. (Doc. 106-5 at 182–83; Doc. 106-9 at 87–88). At some point before making a decision on the Director position, Lescota checked with Fuller regarding the

investigation into Johnson's conduct, and Fuller explained that the investigation had found no wrongdoing. (Doc. 106-9 at 32–33, 38–40; Doc. 106-19 at 24).

Lescota ultimately named Johnson the Unit's permanent Director in March 2020. (Doc. 106-9 at 15–16). On March 9, 2020, Johnson texted a co-worker at Grady about the news. (Banks SMF ¶ 36; Doc. 106-8 at 105–06). In the exchange, Johnson commented that she was in favor of having all staff managers—like Banks, whom she believed didn't have enough management experience—reapply for their positions in order to "secure a winning team." (Doc. 106-8 at 106). Shortly after assuming the permanent Director role, Johnson emailed Lescota an assessment of issues she perceived within the Unit, along with proposed solutions. (Banks SMF ¶ 39; Doc. 106-6 at 50–52). Johnson acknowledged that certain "[b]ehaviors and lack of interpersonal skills have plagued the effort and teamwork and comradery with the staff." (Doc. 106-6 at 51). She proposed to change the Unit's work culture, in part, by "hir[ing] staff from different ethnic groups as well as generations in [an] effort to make the staff more diverse . . . [and] encourag[ing] my [Clinical Staff Managers] to do the same and respect each staff member and their differences." (Id. at 52). According to Banks, after Johnson was named permanent Director, Johnson further excluded her from communications and managerial decisions relating to the Unit's staff. (Banks SMF ¶ 38).

On April 30, 2020, Lescota and Johnson met with Banks to address recent feedback they had received about Banks's performance and conduct as a Clinical Staff Manager. (Banks SMF ¶ 40; Grady/Banks SMF ¶ 81). For example, the Director of Grady's Neonatal Intensive Care Unit ("NICU") had expressed concern to Lescota that Banks didn't know how to admit a baby from the NICU into the Unit. (Doc. 106-5 at 193–95; Doc. 106-9 at 100). Separately, a Unit nurse expressed concerns about Banks's management ability, and another nurse filed a written complaint just a day before the meeting because Banks had apparently refused to provide assistance after repeated requests. (Grady/Banks SMF ¶¶ 78–79; Doc. 106-9 at 106–11; Doc. 106-11 at 288; Doc. 106-19 at 30). Lescota and Johnson spoke with multiple staff members before meeting with Banks, and the pair decided that it would be best if Lescota led the discussion given the history between Banks and Johnson. (Grady/Banks SMF ¶ 80; Doc. 106-9 at

115–16).  Although Lescota and Johnson each testified that Banks was instructed not to contact any of the individuals who had been interviewed beforehand, and Lescota's notes from the day of the meeting reflect as much, Banks herself testified that she was only instructed to avoid contacting a single, specific complainant.  (Banks SMF ¶ 42; Grady/Banks SMF ¶¶ 83, 88; Doc. 106-11 at 288).  Banks went home after the meeting, and later that day she reached out to two of the nurses who had been interviewed; however, neither was the specific complainant that she had been instructed to avoid.  (Banks SMF ¶ 43).  Those nurses then reported the contact to Johnson.  (Grady/Banks SMF ¶ 84; Doc. 106-19 at 31).  Soon after Johnson learned of Banks's contact with the nurses, she emailed Lescota and stated that she considered the contact "clear insubordinate behavior."  (Banks SMF ¶ 44; Doc. 106-19 at 31).

The following day, Lescota contacted Fuller in Human Resources and explained the situation.  (Doc. 106-9 at 133).  The decision was made to issue Banks a final written reprimand, although there is some uncertainty as to who made the decision and why.  Lescota testified that the decision to discipline Banks was reached exclusively in coordination with Fuller based on Banks's insubordination, although she acknowledged that Johnson may have prepared an initial draft of the written reprimand.  (Id. at 134–37).  Meanwhile, Fuller testified that he believed the decision was a "joint effort" between Lescota and Johnson based on Banks's overall performance, which he reviewed but didn't independently investigate.  (Doc. 106-18 at 78–79, 88).  For her part, Johnson testified that the decision to issue the reprimand was made solely by Lescota and Human Resources without her own involvement.  (Doc. 106-5 at 211–12, 217).

In any event, on May 6, 2020, Lescota and Johnson met with Banks in Johnson's office to present her with the final warning.  (Banks SMF ¶ 46).  The final warning describes the underlying incident as follows:

> Met with Samantha [Banks] on 4/30/20 to discuss reports from staff members, peers and leadership about concerns with communication, response to requests, skills and managing workflow. . . .  [Banks] was asked not to go directly to staff members that came forward regarding their statements and to assure this would not happen.

> [Banks] stated that she would not do this.  Later that
> evening, it was discovered that [Banks] contacted at least
> two staff members to discuss the conversation and [her]
> interaction with [her] leaders.  Therefore, [Banks] ha[s]
> violated Grady policy . . . as it relates to insubordination.

(Doc. 106-6 at 47).    During the meeting, Johnson and Lescota
underscored how important it was not to contact employees during a
pending investigation.  (Doc. 106-5 at 220–21; Doc. 106-9 at 151).
When Banks responded that she had a right to contact the other nurses,
Johnson explained the impropriety of such conduct by citing to the
instance months earlier when she herself was instructed not to contact
Banks during the December 2019 investigation, even though she had to
"bite her tongue" not to do so.  (Grady/Banks SMF ¶ 95; Doc. 106-5 at
149, 220–21).    Banks became very upset when presented with the
reprimand and refused to sign it.  (Doc. 106-5 at 219–20; Doc. 106-9 at
154–57).    She then left the room and emailed her resignation later that
day, effective immediately.  (Grady/Banks SMF ¶ 98; Doc. 106-2 at 41;
Doc. 106-19 at 36).    Not long after, Johnson sent the following text
message to two colleagues at Grady, referencing the resignation of
Banks and, presumably, two other Unit nurses: "Well Linda, it
happened!!!!  Kiwana resigned, Seyi resigned and Samantha [Banks]
abruptly resigned today!!    Nicole [Lescota] is taking care of
business!!!!"  (Banks SMF ¶ 50).

See R&R at 2–12.  As for Plaintiff Sanusi:

> [she] is originally from Sierra Leone and has lived and worked in the
> United States for over 30 years.  She began working at Grady in
> February 2017.  Echoing Banks's allegations regarding the Unit's
> nursing staff divide, she claims that she was terminated on October 6,
> 2020 because she too opposed Johnson's conduct and/or because
> Johnson discriminated against African-born nurses.
>
> . . .
>
> As already described, in February 2020, Sanusi sat on a panel that
> interviewed Johnson when Johnson was a candidate for the Unit's
> permanent Director position.  (Banks SMF ¶ 29; [Plaintiff Sanusi's
> Statement of Material Facts ("Sanusi SMF") ¶ 14 [Doc. 105-1]];

[Grady's Statement of Material Facts as to Amy Sanusi ("Grady/Sanusi SMF") ¶ 40 [Doc. 101-2]]).  During the interview, Sanusi asked Johnson how she would address favoritism on the Unit given the perception that non-American nurses were treated worse than American nurses.  (Doc. 106-23 ¶ 10).  She also asked Johnson how she would ensure the Unit's diversity through hiring.  (Id.)  As noted above, Johnson told the panelists she had specifically requested that Human Resources send her diverse nursing candidates because "you can't have too much of the same."  (Banks SMF ¶ 30; Sanusi SMF ¶ 15).  After Johnson's interview, Sanusi and the other panelists met with Lescota without Johnson present, at which time Sanusi, Banks, and another nurse voiced their opinion that Johnson unfairly disciplined African nurses.  (Sanusi SMF ¶ 17).

Sanusi testified that, after the panel debrief with Lescota, Johnson made a "360-degree turn" in her behavior toward Sanusi, stating that: "[Johnson] [was] coming full force now against me."  (Id. ¶ 20; Doc. 106-3 at 121).  And in March 2020, Sanusi told Lescota that she was afraid of being retaliated against.  (Sanusi SMF ¶ 23; Doc. 106-3 at 173).  However, she didn't elaborate because, as she later testified, she was concerned that Johnson might find out.  (Grady/Sanusi SMF ¶¶ 56–58; Doc. 106-3 at 174–75).  In April 2020, Johnson removed Sanusi as a charge nurse—i.e., a nurse with increased operational responsibilities—and replaced her with an American.  (Sanusi SMF ¶ 24).  According to Sanusi, sometime prior to her removal, she overheard one of Johnson's work associates say that she wouldn't join the Unit until certain African nurses were gone.  (Id. ¶ 25; Doc. 106-3 at 163).

. . .

On September 17, 2020, two new mothers in the Unit did not have their blood pressures taken for an entire twelve-hour shift.  (Sanusi SMF ¶ 30; Grady/Sanusi SMF ¶ 61; Doc. 106-4 at 60).  The patients were assigned to a new nurse in orientation, but Sanusi—who was paid to act as a preceptor (experienced nursing guide)—was responsible for overseeing the new nurse.  (Grady/Sanusi SMF ¶ 66; Doc. 106-3 at 241–42; Doc. 106-5 at 258–60).  Although Sanusi completed a shift report indicating that the patients' blood pressures had in fact been taken, computer records showed the contrary.  (Grady/Sanusi SMF

¶ 63). After discovering the oversight, the patients' doctor submitted an incident report. (Id. ¶ 62; Doc. 106-15 at 21).

Just over two weeks later, on October 2, 2020, Sanusi was assigned to a new mother who had been experiencing high blood pressure. (Grady/Sanusi SMF ¶ 72). A technician assisting Sanusi that day took a reading which showed the patient's blood pressure was elevated. (Id. ¶¶ 73–74; Doc. 106-3 at 230–33). The technician promptly notified Sanusi, who took a second reading that confirmed as much. (Sanusi SMF ¶ 34; Grady/Sanusi SMF ¶¶ 73–74; Doc. 106-3 at 230–33). Sanusi did not immediately notify the presiding doctor, however, but instead left the patient to attend to another patient across the hall. (Sanusi SMF ¶ 35; Doc. 106-3 at 232; Doc. 106-23 ¶ 18). When she returned, up to five minutes later, Sanusi encountered the patient's doctor in the room. (Sanusi SMF ¶ 36; Doc. 106-3 at 232–33; Doc. 106-23 ¶ 18). Sanusi explained to the doctor that she was just about to call regarding the elevated readings, but the doctor was very upset that she had not been immediately contacted. (Sanusi SMF ¶ 36; Grady/Sanusi SMF ¶ 78; Doc. 106-3 at 233–34). The doctor then filed an incident report with the following detail:

> [The] [p]atient was noted to have severely elevated [blood-pressure readings] for 4 hours with no phone call from [Sanusi]. When [Sanusi] was confronted about issue, she lied and stated that none of the blood pressure readings on the machine in the patient's room belonged to the patient despite patient attesting that [the] machine had remained in her room all night and was not being used on other patients.

(Doc. 106-6 at 57). Johnson investigated the matter and discovered that the blood-pressure machine's clock was incorrect, but she confirmed that the elevated readings did in fact belong to the patient. (Sanusi SMF ¶ 44; Grady/Sanusi SMF ¶ 80; Doc. 106-5 at 265–66; Doc. 106-7 at 39–41). Although the clock error meant that the patient's blood-pressure readings had not occurred hours earlier, as the doctor apparently believed, Johnson testified that the readings indicated the patient was nevertheless in "a very critical state" and required immediate attention. (Grady/Sanusi SMF ¶¶ 75, 82; Doc. 106-5 at 267). Lescota similarly testified that, per Unit protocol, a nurse should call a doctor following

a second high-blood pressure reading. (Grady/Sanusi SMF ¶ 76; Doc 106-9 at 235).

Johnson met with Sanusi later on the day of October 2, 2020 to discuss the incident, and she directed Sanusi to submit a written explanation by October 5, 2020. (Sanusi SMF ¶ 39; Grady/Sanusi SMF ¶¶ 83–84). Shortly after the meeting, Johnson emailed Lescota and Fuller, advising them that she had discussed both the September 17, 2020 events as well as the incident from earlier that day with Sanusi. (Sanusi SMF ¶ 41; Grady/Sanusi SMF ¶ 86; Doc. 106-19 at 56). According to the email, Johnson stressed the importance of monitoring patient blood pressure, but Sanusi had responded by accusing Johnson of trying to fire her as she abruptly walked out of the meeting. (Grady/Sanusi SMF ¶ 86; Doc. 106-19 at 56). Sanusi, however, denies leaving the meeting early. (Doc. 106-23 ¶ 20).

Based on Johnson's email, Lescota recommended that Sanusi be issued a final warning or terminated due to insubordination and failure to take responsibility for patient safety, and she directed Johnson to prepare a timeline of recent misconduct. (Sanusi SMF ¶ 42; Grady/Sanusi SMF ¶ 88; Doc. 106-19 at 55). Fuller concurred, but suggested they hold off on making a final decision until October 5, 2020, after giving Sanusi time to prepare her statement. (Sanusi SMF ¶ 43; Grady/Sanusi SMF ¶ 89; Doc. 106-19 at 55). Later that day, Johnson emailed Sanusi and informed her that she was suspended pending completion of an investigation. (Grady/Sanusi SMF ¶ 92; Doc. 106-4 at 71). Johnson subsequently prepared a timeline of Sanusi's disciplinary actions, which included the September and October 2020 incidents, plus other occasions when Sanusi was reprimanded for, variously, sleeping at work and missing a meeting. (Grady/Sanusi SMF ¶ 9; Doc. 106-11 at 306–07).

On October 5, 2020, Johnson left Sanusi a voicemail stating that she had completed the investigation into recent events. (Sanusi SMF ¶ 47; Doc. 106-6 at 64 (audio recording)). Johnson prepared termination paperwork just in case Sanusi did not submit a written statement, but she didn't want to make a final decision until she read Sanusi's explanation. (Grady/Sanusi SMF ¶ 91; Doc. 106-5 at 274, 279). Sanusi failed to provide a written statement as directed, however, and the next day, October 6, 2020, Johnson met with Sanusi to present her with an

official notice of termination.  (Sanusi SMF ¶ 48; Doc. 106-11 at 317–18).  The notice describes the underlying incidents as follows:

> On 9/17/2020 and 10/2/2020, the [Unit] received incident reports of two separate incidents involving you failing to provide adequate patient care.  More specifically, the incident reports indicated 2 patients did not have vital signs done during your 12-hour shift.  Upon looking at your other patients assigned on 9/17/2020, none had vitals recorded.  On 10/2/2020, you had a patient with out of range [blood] pressures; in which you failed to notify the Doctor.  When asked for your statement on the above matters, you abruptly left the room in the midst of our conversation.  These actions are[] a violation of Grady policy . . . as it relates to unsatisfactory work performance and failure to follow department policies and procedures.

(Doc. 106-11 at 317).  Sanusi refused to sign the termination notice and left the room.  (Grady/Sanusi SMF ¶ 95).  Although Johnson was heavily involved in the decision to terminate Sanusi, both Fuller and Lescota testified that the decision was warranted by the recent incident reports.  (Id. ¶ 94).  Later that night, Johnson privately texted her brother about the termination.  (Id. ¶¶ 97–98).  She explained that the termination "didn't go well," but she recounted the recent incidents, opined that Sanusi was going to "kill somebody" if she didn't improve her performance, and dismissed any allegation of discrimination by noting that several of her subordinates were African.  (Doc. 106-8 at 75).

. . .

Banks and Sanusi initiated this consolidated action in February 2021, each asserting two distinct claims against Grady.  (Doc. 1).  First, Banks claims that she was harassed and disciplined (Count IV) and ultimately constructively discharged (Count V) in retaliation for her opposition to Johnson's alleged practice of discriminating against African-born nurses.  Next, Sanusi claims that she was terminated because of her national origin (Count II) or, alternatively, because she too opposed Johnson's discriminatory conduct (Count III).

See R&R at 12–18 (internal footnote omitted).  Plaintiff Sanusi "initially asserted a third claim for retaliatory denial of a promotion (Count I), but she expressly abandoned the claim during briefing."  Id. at 18 n.3 (citing [Doc. 105 at 3 n.1]).

"After discovery concluded, Grady moved for summary judgment as to all claims.  (Docs. 101, 103).  Grady's motions are now ripe for review."  Id. at 18.  On December 19, 2022, the Magistrate Judge issued the instant R&R, by which she recommends that the undersigned grant both of Defendant's motions for summary judgment and enter judgment action in Defendant's favor on all remaining claims.  Id. at 49.  Specifically, the Magistrate Judge recommends entering summary judgment on Plaintiff Banks' claims for retaliation in violation of Title VII (Count IV for "harassment and discipline" and Count V for constructive discharge) because Plaintiff Banks fails to "ma[ke] out a prima facie case of retaliation," but even if she did, "she also failed either to rebut [Defendant's] legitimate rationale for its actions or to otherwise demonstrate that her complaints about Johnson were the but-for cause of the disciplinary events in April and May 2020."  See id. at 33–34.  This includes the "final warning" Plaintiff Banks received on May 6, 2020, which the Magistrate Judge further reasons "does not [itself] constitute the type of action that would compel a reasonable person to resign."  See id. at 33, 35–36 (citing Williams v. Russell Corp., 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002)).

The Magistrate Judge recommends entering summary judgment on Plaintiff Sanusi's claims for discriminatory termination on the basis of national origin (Count II) and retaliatory termination (Count III) because Plaintiff Sanusi fails to establish a prima facie case of discrimination, Defendant presents a legitimate nondiscriminatory reason for Plaintiff Sanusi's termination (which she does not directly rebut), and Plaintiff Sanusi "fail[s] to introduce enough evidence to suggest that Johnson, the driving force behind her termination, was instead motivated by a discriminatory animus." See id. at 40–41, 47–49.

After seeking and receiving extensions of their respective briefing deadlines, Plaintiffs timely filed their objections to the Magistrate Judge's above recommendations, and Defendant timely responded in opposition to Plaintiffs' objections.[1] [See Docs. 125, 128, 130, 133]. Having been fully briefed, Plaintiffs' objections are ripe for the Court's review, and the undersigned begins by setting forth the relevant legal standards.

---

[1] Subsequently, Plaintiffs filed a reply brief in support of their objections. [Doc. 134]. However, neither Federal Rule of Civil Procedure 72 nor this district's Local Rule 72 provide for the filing of reply briefs to objections in the R&R context. See, e.g., Kemp v. Gen. Growth Servs., Inc., Civil Action No. 1:15-CV-01180-SCJ, 2017 WL 8217632, at *2 n.2 (N.D. Ga. Mar. 6, 2017) ("the Court does not understand Federal Rule of Civil Procedure 72(b)(2) to provide for a reply brief in the objections to an R&R context"); Hollan v. Web.com Grp., Inc., Civil Action No. 1:14-CV-00426-LMM, 2015 WL 11237033, at *1 (N.D. Ga. July 1, 2015) ("Neither Federal Rule of Civil Procedure 72(b)(2) nor Local Rule 72 provide for reply briefs to responses to objections to a report and recommendation."). The Court does not find the present action warrants an exception to these Rules. See FED. R. CIV. P. 72(b)(2); see also LR 72.1(B), NDGa. Accordingly, the Court declines to consider Plaintiffs' reply in support of their objections to the R&R. [Doc. 134].

## II.    Legal Standards

### A.    Review of a R&R

The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." See 28 U.S.C. § 636(b)(1); see also FED. R. CIV. P. 72(b)(3). Portions of the R&R to which no objections have been made are reviewed for clear error. See Thomas v. Arn, 474 U.S. 140, 154 (1985); see also Macort v. Prem, Inc., 208 F. App'x 781, 784 (11th Cir. 2006); Tauber v. Barnhart, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006). However, the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1); see also FED. R. CIV. P. 72(b)(3). A party objecting to a R&R "must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." See United States v. Schultz, 565 F.3d 1353, 1361 (11th Cir. 2009) (quoting Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988)).

### B.    Summary Judgment Motions

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." See FED. R. CIV. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the

non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome pursuant to the governing law.  See id.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial.  See id. at 324–26.  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  See Anderson, 477 U.S. at 251–52.  "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment.  See id. at 252.  There must be evidence on which a jury could reasonably find for the non-moving party.  See id.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

party, there is no genuine issue for trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting <u>Matsushita Elec. Industr. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986)).   However, the Court is not obligated to "scour the record" to determine whether triable issues exist.   <u>See Tomasini v. Mt. Sinai Med. Ctr. of Fla., Inc.</u>, 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004).

## III.   Discussion

Having set forth the relevant legal standards, the Court turns to Plaintiffs' objections to the R&R.[2]  [Doc. 128].  In their objections, Plaintiffs contend that the Magistrate Judge erred in four (4) ways:

> by (1) drawing factual inferences in Grady's favor; (2) omitting, rejecting, or downplaying evidence in favor of the Plaintiffs, including minimizing evidence of discriminatory animus because Sanusi did not personally witness it; (3) requiring very close temporal proximity to prove retaliation claims, which is contrary to law; and (4) failing to recognize that genuine issues of material fact create a jury issue on whether Grady's alleged justifications for the adverse actions were sincerely held.

[Doc. 128 at 1].  As noted, Defendant opposes Plaintiffs' objections.  [Doc. 134]. The Court examines Plaintiffs' objections with respect to each of their claims below.

---

[2] The Court has reviewed for clear error those portions of the R&R to which no objections have been made and finds no error.  <u>See</u> <u>Thomas</u>, 474 U.S. at 154; <u>see also</u> <u>Macort</u>, 208 F. App'x at 784.

### A.    Plaintiff Banks' Claims

### 1.    Retaliation

The Court begins with those objections that pertain to Plaintiff Banks' claim for retaliation (Count IV).  Plaintiffs object that the Magistrate Judge erred in a variety of ways in her analysis of both causation and Defendant's proffered reason for its adverse employment action against Plaintiff Banks.  [See generally Doc. 128].  As relevant here,

> [t]o make a prima facie case for a claim of retaliation under Title VII, a plaintiff must first show (1) that "she engaged in statutorily protected activity," (2) that "she suffered an adverse action," and (3) "that the adverse action was causally related to the protected activity." Jefferson v. Sewon Am., Inc., 891 F.3d 911, 924 (11th Cir. 2018); Bryant v. Jones, 575 F.3d 1281, 1307–08 (11th Cir. 2009).
>
> Once the prima facie case is established, it creates a "presumption that the adverse action was the product of an intent to retaliate." Bryant, 575 F.3d at 1308.  The burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action.  Id.  If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the "proffered reason was merely a pretext to mask [retaliatory] actions."  Id.  To establish the necessary causation, a plaintiff must demonstrate that "her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tx. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 [] (2013).  In other words, "a plaintiff must prove that had she not [engaged in the protected conduct], she would not have been fired."  Jefferson, 891 F.3d at 924.  "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." Sims v. MVM, Inc., 704 F.3d 1327, 1333 (11th Cir. 2013).

Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1134–35 (11th Cir. 2020) (first and third alterations in original). The Magistrate Judge reasons, and the undersigned agrees, that Plaintiff Banks meets the first element of a prima facie retaliation claim because she engaged in statutorily protected activity pursuant to Title VII when she "reported her opposition to Johnson's conduct" of discriminating against employees on the basis of national origin "to several persons in a position to remedy the alleged wrongdoing[.]" See R&R at 23 (citing Rollins v. State of Fla. Dep't of Law Enf't, 868 F.2d 397, 400 (11th Cir. 1989) and Zarza v. Tallahassee Hous. Auth., 686 F. App'x 747, 753 (11th Cir. 2017)).

Second, the R&R assumes that Plaintiff Banks suffered two (2) actionable adverse actions, and for the sake of the instant analysis, the undersigned assumes without deciding that two (2) adverse actions did occur. See R&R at 26–27. To satisfy this second prong for a prima facie retaliation case, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). Here, the supposed adverse actions occurred during (1) the April 30, 2020 meeting between Plaintiff Banks, Lescota, and Johnson to address recent feedback Lescota and Johnson had received about Plaintiff Banks' performance and

conduct as a Clinical Staff Manager; and (2) the May 6, 2020 meeting wherein Banks was issued the Final Warning. As the Magistrate Judge notes, Plaintiff Banks "[n]otably . . . does not argue" in her summary judgment briefing "that the April 30, 2020 meeting was unjustified." See R&R at 30.

Regarding the third prima facie element, causation, the Magistrate Judge reasons that it is lacking based on the dearth of temporal proximity between the adverse actions and the protected activity as well as Defendant's good faith reason for holding the May 6, 2020 meeting and issuing the Final Warning. [See Doc. 128 at 12–15]. Plaintiff Banks objects to the Magistrate Judge's findings and instead argues that the May 6, 2020 meeting and Final Warning she received during it were caused by Johnson's retaliatory animus. See R&R at 33; [see also Doc. 128 at 15–16].

Even setting aside any issue regarding the Magistrate Judge's analysis of temporal proximity, Plaintiff Banks' objection is premised on a factual dispute regarding whether she actually disobeyed an instruction she may or may not have been given at the conclusion of the April 30, 2020 meeting. [See Doc. 128 at 15–16] ("If the Court credits Banks's testimony, as it must at this stage, Johnson and Lescota are not telling the truth and did not sincerely believe the grounds for the adverse action."). Defendant argues Plaintiff Banks was instructed not to contact any other employees about the April 30, 2020 meeting, during which Lescota and

Johnson went over complaints other employees had relayed about Plaintiff Banks'
performance.  See Grady/Banks SMF ¶¶ 83, 88; [see also Docs. 106-11 at 288; 134
at 11].  According to Plaintiff Banks' testimony, she only learned the identity of one
complainant during the April 30, 2020 meeting, and the only contact from which she
was instructed to refrain was with that single individual (since the sources of the
other complaints remained unknown to Plaintiff Banks).  See Deposition of
Samantha Banks ("Banks Dep.") at 25:2–8 [Doc. 106-1].  Plaintiff Banks claims that
while she did discuss the April 30, 2020 meeting with other employees, she did not
contact the single individual named during that meeting who had complained.  [See
Doc. 128 at 14].  Plaintiff Banks maintains that her conversations with others about
the April 30, 2020 meeting were not prohibited and did not warrant Plaintiff Banks
being called into the May 6, 2020 meeting for "insubordination" (the reason
proffered by Defendant).  [See id. at 12–13].  Therefore, Plaintiff Banks contends
that the May 6, 2020 meeting and Final Warning were caused by retaliatory animus
instead of any actual insubordination on her part.  [See id. at 14].  Plaintiff Banks
asserts that the Magistrate Judge should have found, at minimum, a genuine question
of material fact regarding whether retaliatory animus was the reason for the May 6,
2020 meeting and Final Warning based on "Johnson's open elation about [Plaintiff]
Banks resigning" in text messages and Johnson's deposition testimony that she felt

personally attacked by Plaintiff Banks' complaints about her.[3]   [See id. at 13]; see also R&R at 31.

Even assuming Plaintiff Banks establishes the third prima facie element of her retaliation claim, and thus meets her prima facie burden in its entirety, the Court's analysis does not end there.[4]   As noted above, the burden shifts to Defendant to produce evidence to "rebut the presumption" that the adverse action was motivated by retaliatory animus "by articulating a legitimate, non-discriminatory reason for the employment action."   See Gogel, 967 F.3d at 1135 (quoting Bryant, 575 F.3d at 1308); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).   "If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the 'proffered reason was merely a pretext to mask [retaliatory] actions.'"   See Gogel, 967 F.3d at 1135 (alteration in original) (quoting Bryant, 575 F.3d at 1308); see also Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that the proper inquiry is not whether the employee

---

[3] The Court notes that it remains unclear whether Johnson was aware of Plaintiff Banks' complaints about her at the time of either the April or May 2020 meetings, and "[i]n order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action."   Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (internal citations omitted).

[4] Assuming that Plaintiff Banks meets her prima facie burden for her retaliation claim, the Court need not address her objection to the Magistrate Judge's reasoning that the promotion Plaintiff Banks received in 2019 constitutes "circumstantial evidence [that] further militates against a finding that, but for Banks'[] complaints about Johnson, she would not have been disciplined."   See R&R at 32; [see also Doc. 128 at 6].   Similarly, assuming Plaintiff Banks meets her prima facie burden, Plaintiffs' objection regarding whether Defendant's human resources department "officially completed" an investigation of Johnson and the significance of the same is rendered moot.   See R&R at 42; [see also Doc. 128 at 8].

was guilty of misconduct but whether the employer in good faith believed the employee had done wrong and whether this belief was the reason for the adverse action).

Upon de novo review, the Court agrees with the Magistrate Judge that Defendant meets its burden to articulate a legitimate, non-discriminatory reason for the May 6, 2020 meeting and corresponding Final Warning to Plaintiff Banks. See R&R at 28–29. Regardless of whether Plaintiff Banks actually "contacted multiple nurses who had been interviewed in connection with the" April 30, 2020 meeting, see id. at 28, Defendant's burden is to put forth evidence supporting that it had a good faith belief that Plaintiff Banks engaged in insubordination. See E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) ("In the workaday world, not every personnel decision involving a false statement (or a cover-up) has to be treated as something like a trial for perjury. Therefore, an employer, in these situations, is entitled to rely on its good faith belief about falsity, concealment, and so forth."); see also Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1327 (11th Cir. 2020) (finding that the employer-defendant "offered a legitimate, nondiscriminatory reason"—"namely, insubordination"—for disciplining an employee based on his "inappropriate methods of complaining"); Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) (holding that legitimate, nondiscriminatory reasons include "poor work performance [and] failure to follow department procedures"). Ms. Lescota

directly testified during her deposition that she told Plaintiff Banks that the May 6, 2020 meeting had been called based on a "direct violation of [company] policy" and informed Plaintiff Banks she had been "insubordinate in that" respect before issuing the Final Warning at the conclusion of that meeting.  <u>See</u> Deposition of Nicole Lescota ("Lescota Dep.") at 145:25–146:3 [Doc. 106-9].

Thus, because Defendant meets its burden to articulate a legitimate, non-discriminatory reason for the May 6, 2020 meeting and corresponding Final Warning, the burden shifts back to Plaintiff Banks to "demonstrate that the 'proffered reason was merely a pretext to mask [retaliatory] actions.'"  <u>See</u> <u>Gogel</u>, 967 F.3d at 1135 (alteration in original) (quoting <u>Bryant</u>, 575 F.3d at 1308); <u>accord</u> <u>Rojas</u>, 285 F.3d at 1342 (citing <u>McDonnell Douglas</u>, 411 U.S. at 1825).  Plaintiff Banks does not offer any evidence to suggest the existence of pretext beyond speculating that "[i]f Johnson and Lescota knew they had not given [the disputed] directive but were looking for a way to rid themselves of the oft-complaining [Plaintiff] Banks, they lacked a sincere, good-faith belief that she had violated a work rule."  [Doc. 128 at 14].  This speculation is insufficient to demonstrate that Defendant's proffered reasoning for taking the adverse actions is pretextual. Regardless of who Plaintiff Banks was instructed to refrain from contacting after the April 30, 2020 meeting, evidence in the record supports that Lescota, as Vice President of Women's Services for Defendant, believed in good faith that Plaintiff

Banks had been insubordinate by contacting several colleagues after that meeting. See Lescota Dep. at 145:25–146:3. Even if that belief was mistaken, it does not make it pretextual. E.g., Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct. An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, *as long as its action is not for a discriminatory reason*." (emphasis in original and internal quotation omitted)); Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995) ("Pretext is not demonstrated by showing simply that the employer was mistaken.").

Thus, the Court finds Defendant is entitled to summary judgment on Plaintiff Banks' retaliation claim in Count IV. Therefore, the Court overrules Plaintiffs' objections on this claim.[5]

### 2. Constructive discharge

Next, Plaintiffs object to the Magistrate Judge's recommendation that the undersigned grant summary judgment in favor of Defendant on Plaintiff Banks' constructive discharge claim (Count V). [See Doc. 128 at 19–20]. In support,

---

[5] Because the Court finds that, even assuming Plaintiff Banks successfully demonstrates all three (3) elements of her prima facie retaliation claim, that claim ultimately fails, the Court need not reach those objections by Plaintiffs that solely concern the Magistrate Judge's analysis of the prima facie elements of the claim, as those objections do not impact the Court's conclusion here. [See Doc. 128 at 10–13].

Plaintiffs argue that the Magistrate Judge should have found that, when Plaintiff Banks received the Final Warning, it "immediately altered her employment status" because she was "threatened . . . with termination by a supervisor who was openly expressing retaliatory animus and was told that she would be terminated if she left the room without signing it." [Doc. 128 at 19]. In support of their objection, Plaintiffs cite to Plaintiff Banks' sworn statement, wherein she avers:

> I refused to sign the unwarranted final written discipline form because it was clearly retaliatory, and doing so would have prevented me from receiving a promotion or transferring within Grady for a full year. In addition, specifically with respect to a write-up for insubordination, other employers would be very wary of hiring me without first speaking with Ms. Johnson and/or Human Resources, who I did not trust would give me a good recommendation. I was told that if I did not sign the final written discipline, I would be terminated immediately. Faced with those consequences, I felt I had no choice but to resign effective immediately.

See Declaration of Samantha Banks ("Banks Decl.") ¶ 22 [Doc. 106-22]. Plaintiffs argue that "[u]nder such circumstances, a reasonable jury could conclude that [Plaintiff Banks'] resignation 'qualified as a fitting response.'" [Doc. 128 at 20] (quoting Penn. State Police v. Suders, 542 U.S. 129, 134 (2004)).

To succeed on a claim of constructive discharge, a plaintiff must "show that the conditions of employment were so unbearable that a reasonable person would be compelled to resign." Palmer v. McDonald, 624 F. App'x 699, 704 (11th Cir. 2015); accord Poague v. Huntsville Wholesale Furniture, 369 F. Supp. 3d 1180, 1199 (N.D. Ala. 2019) ("a plaintiff must plead facts that tend to show that an employer

deliberately ma[de] an employee's working conditions intolerable[,]" meaning "so unbearable that a reasonable person in that person's position would be compelled to resign" (internal quotation marks omitted) (quoting Bryant, 575 F.3d at 1298)).

As a preliminary matter, Plaintiff Banks cannot base her constructive discharge claim on speculation about what future potential employers might think if they learned she received a formal write-up while working for Defendant or unmaterialized suspicions about what Ms. Johnson (or Defendant's human resources office) might say if asked for a recommendation from a future employer. See, e.g., Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 n.4 (11th Cir. 2003) (statements from co-workers informing African-American plaintiff that his supervisor planned to terminate him at some point in the future because of his race did not rise to level of constructive discharge because "[m]ere suspicion of an unsubstantiated plot is not an intolerable employment condition" and "[t]he employer might never carry out the plan"); Medearis v. CVS Pharmacy, Inc., 92 F. Supp. 3d 1294, 1314 (N.D. Ga. 2015) (plaintiff failed to show constructive discharge when he claimed that he was "treated with hostility" by his supervisor, and that his supervisor laughed at him and told him he would be fired within a year), aff'd sub nom. Medearis v. CVS Pharmacy, Inc., 646 F. App'x 891 (11th Cir. 2016). Instead, the constructive discharge inquiry turns on whether Plaintiff Banks' work environment at Grady became so intolerable as a result of the May 6, 2020 meeting

and Final Warning that "a reasonable person in that person's position would be compelled to resign[.]" <u>Poague</u>, 369 F. Supp. 3d at 1199.

Plaintiffs are correct that, accepting as true Plaintiff Banks' sworn statement, the terms of her employment might have changed if she had signed the Final Warning and was rendered ineligible for promotion or transfer within Grady for one year as a result. <u>See</u> Banks Decl. ¶ 22. However, the Court finds Plaintiff Banks' constructive discharge claim still fails because her own sworn statement reveals she did not resign due to alleged retaliation. <u>See</u> <u>id.</u> While Plaintiff Banks states that she felt the Final Warning was "retaliatory," she further states that she "was told that if [she] did not sign the final written discipline, [she] would be terminated immediately[,]" and that "[f]aced with those consequences, [she] felt [she] had no choice but to resign effective immediately." <u>See</u> <u>id.</u> As another district court in this Circuit has explained, where "[a] plaintiff resign[s] because she [does] not want to stay and risk being terminated[,] she [does] not resign because her working conditions were intolerable[.]" <u>Graham v. Methodist Home for the Aging</u>, No. 2:11-CV-1416-SLB, 2012 WL 3637587, at *20 (N.D. Ala. Aug. 20, 2012) (further finding that even though the plaintiff may have felt "felt under attack and vulnerable, . . . no reasonable person would have felt *compelled* to resign in light of" a final disciplinary warning (emphasis in original)). Moreover,

> [t]he Eleventh Circuit has held that an employee's decision to resign in the face of *possible* termination is not a constructive discharge. <u>Rowell</u>

v. BellSouth Corp., 433 F.3d 794, 806 (11th Cir. 2005); Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th Cir. 1995). A plaintiff cannot, as a matter of law, contend that she was discharged unless she can demonstrate that she had no objectively reasonable opportunity to remain employed. Indeed, "the *possibility* that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.'" Rowell, 433 F.3d at 806 (emphasis added). "Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that [the] plaintiff *had a choice*. Plaintiff could stand pat and fight." Hargray, 57 F.3d at 1568 (quoting Christie v. United States, 518 F.2d 584, 587[] (1975)) (internal quotations omitted; emphasis in Hargray).

See id. (emphasis in original). Accordingly, the Court finds that Defendant is entitled to summary judgment on Plaintiff Banks' constructive discharge claim and overrules Plaintiffs' objections on this basis.

### B.    Plaintiff Sanusi's Claims

Plaintiffs object to the Magistrate Judge's recommendations that the undersigned grant summary judgment in favor of Defendant on Plaintiff Sanusi's claims for discriminatory termination on the basis of national origin (Count II) and retaliatory termination (Count III).[6] [See generally Doc. 128]. As discussed above, a plaintiff must establish the prima facie elements of her Title VII claims before the burden shifts back to the defendant to provide evidence of a legitimate, nondiscriminatory reason for the adverse employment action, at which point the

---

[6] As the R&R observes, Plaintiff Sanusi expressly abandoned her claim for retaliatory denial of promotion in Count I. See R&R at 18 n.3.

burden returns to the plaintiff, who must show that the defendant's proffered reason is merely pretext for retaliatory or discriminatory actions.  See Gogel, 967 F.3d at 1134–35.

Upon de novo review, the Court finds that Defendant is entitled to summary judgment on Plaintiff Sanusi's claims because Defendant offers legitimate nondiscriminatory reasons for terminating Plaintiff Sanusi: the two (2) incidents on September 17, 2020, wherein "two new mothers in the Unit did not have their blood pressures taken for an entire twelve-hour shift" while they were under the supervision of a new nurse who Plaintiff Sanusi was being paid to train, Plaintiff Sanusi falsely recorded "that the patients' blood pressures had in fact been taken[,]" and a physician filed an incident report; and a single incident on October 2, 2020, wherein Plaintiff "Sanusi was assigned to a new mother who had been experiencing high blood pressure[,]" the patient's blood pressure was dangerously elevated, and Plaintiff Sanusi failed to immediately notify the patient's physician, resulting in another incident report.  See R&R at 15–16 (internal citations omitted).

Plaintiff Sanusi objects that these incidents were not the true reason she was fired and urges the undersigned to find that Defendant has offered "shifting reasons" for her termination throughout the course of this litigation in a manner that suggests discriminatory animus or evidence of pretext.  [See Doc. 128 at 23].  Specifically, Plaintiff Sanusi cites to a portion of Lescota's deposition wherein Lescota

acknowledges an email she sent to Johnson saying of Plaintiff Sanusi (after she purportedly walked out of a meeting with Johnson, her supervisor): "She is being insubordinate by walking out on you.  I would recommend a final written [warning] and/or termination."  See Lescota Dep. at 208:8–10.  Lescota goes on to testify:

> I knew when we were here at this point it wasn't just about the—the insubordination[,] walking out.  It was the fact that [Plaintiff Sanusi] did not attend her mandatory education, her skills day, mandatory meeting, also not documenting blood pressures, et cetera.  But there was a—a progressive history of her performance that was very concerning to me about the safety of our patients.  Because she was clearly not following protocols and the expectations that we have of our staff.

See id. at 208:19–209:4.

Despite her conclusory assertion to the contrary, Plaintiff Sanusi does not offer evidence to rebut the above legitimate, nondiscriminatory reasons for her termination.  [See Doc. 128 at 22, 26].  And, as the Court explained with regard to Plaintiff Banks' retaliation claim, whether Plaintiff Sanusi *actually* violated the protocols or performance "expectations" at issue is not the determinative question; rather, the crux of the pretext inquiry is whether Defendant had an honest, good faith belief that such violations had occurred.  See, e.g., Damon, 196 F.3d at 1363; Elrod, 939 F.2d at 1470; Sempier, 45 F.3d at 731.  Even considering the declarations Plaintiff Sanusi claims the Magistrate Judge improperly discounted, the Court finds Defendant possessed a good faith belief in the nondiscriminatory reasons for its action and that Plaintiff Sanusi fails to present evidence to the contrary.  [See Doc.

128 at 9–10].  Thus, the Court grants Defendant's motion for summary judgment on Counts II and III and overrules Plaintiffs' objections with regard to the same.

## IV.    Conclusion

For the foregoing reasons, the Court **OVERRULES** Plaintiffs' objections to the R&R [Doc. 128] and **ADOPTS** the R&R as the opinion of this Court. [Doc. 121].  Accordingly, the Court **GRANTS** Defendant's "Motion for Summary Judgment on Plaintiff Amy Sanusi's Claims" and "Motion for Summary Judgment on Plaintiff Samantha Banks' Claims." [Docs. 101, 103].  The Court **DIRECTS** the Clerk to **ENTER JUDGMENT** in favor of Defendant and to **CLOSE** this case.

**SO ORDERED**, this 12th day of September, 2023.

Eleanor L. Ross
United States District Judge
Northern District of Georgia